UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| LEE WOOLVERTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 1:17 CV 170 ACL |
| | ) |
| CITY OF WARDELL, et al., | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

Plaintiff Lee Woolverton filed this action against Defendants City of Wardell, Casey Redden, Chris Rudd, Deputy Edward Holloway, Sheriff Tommy Greenwell, and Western Surety Company,[1] alleging violations of his constitutional rights resulting from an April 2016 traffic stop.  Presently pending before the Court is Defendants Christopher Rudd and Casey Redden's Motion for Summary Judgment.  (Doc. 76.)  The Motion is fully briefed and ripe for disposition.

**Background**

In his First Amended Complaint, Plaintiff asserts an excessive force claim under 42 U.S.C. § 1983 against Defendants Rudd and Redden in their official and individual capacities. Rudd and Redden were police officers employed by the City of Wardell, Missouri, during the relevant time.  Redden stopped the automobile Woolverton was driving on April 11, 2016, in the City of Wardell, for allegedly having loud music playing and a license plate light out.  Defendant Redden then contacted Defendant Rudd to assist Redden with the stop.  The Pemiscot County Sheriff's dispatch told Redden that Woolverton had a warrant out for his arrest from the City of

---

[1]Defendants City of Wardell, Western Surety Company, Deputy Edward Holloway, and Sheriff Tommy Greenwell have been dismissed from this action.  The only remaining Defendants are Officers Chris Rudd and Casey Redden.

Malden for failure to appear.  Woolverton alleges that Defendants Rudd and Redden used excessive force when one or both: (1) slammed his head into a police vehicle; (2) took him to the ground while his hands were cuffed behind his back, causing his leg to break; (3) roughly hauled him about, knowing his leg was broken; and (4) roughly hauled him into the police vehicle instead of calling an ambulance.  Woolverton claims that he suffered serious and continuing injuries as a result of the Defendants' actions.

Defendants Rudd and Redden filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Doc. 41.)  In an Order dated May 14, 2018, the Court granted the Motion as to Woolverton's official capacity claims against Rudd and Redden, but denied it in all other respects.  (Doc. 51.)

Rudd and Redden filed the instant Motion for Summary Judgment on February 20, 2020.  They argue that they are entitled to qualified immunity on Woolverton's excessive force claim because the force exerted on Woolverton was objectively reasonable given the circumstances, and because Woolverton failed to demonstrate that the takedown maneuver employed was a violation of a clearly established constitutional right.  Woolverton responds that Defendants are not entitled to qualified immunity because Defendants assaulted him when he was not combative and did not resist arrest.  He argues that, due to the parties' differing stories, summary judgment is not appropriate.

## **Summary Judgment Standard**

Pursuant to Federal Rule of Civil Procedure 56(a), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S.  317, 322 (1986).  The burden is on the moving party.

*City of Mt. Pleasant, Iowa v. Associated Elec. Co-op. Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A genuine issue of material fact is not the "mere existence of some alleged factual dispute between the parties." *State Auto. Ins. Co. v. Lawrence,* 358 F.3d 982, 985 (8th Cir. 2004). "Instead, the dispute must be outcome determinative under prevailing law." *Mosley v. City of Northwoods,* 415 F.3d 908, 910-11 (8th Cir. 2005) (internal quotations omitted). A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in his favor to allow a jury to return a verdict for him. *Anderson*, 477 U.S. at 249; *Celotex*, 477 U.S. at 324. "If 'opposing parties tell two different stories,' the court must review the record, determine which facts are material and genuinely disputed, and then view those facts in a light most favorable to the nonmoving party – as long as those facts are not 'so blatantly contradicted by the record . . . that no reasonable jury could believe' them." *Reed v. City of St. Charles, Mo*., 561 F.3d 788 (8th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Self-serving, conclusory statements without support are not sufficient to defeat summary judgment. *Armour and Co., Inc. v. Inver Grove Heights,* 2 F.3d 276, 279 (8th Cir. 1993).

In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the nonmoving party and give that party the benefit of any inferences that logically can be drawn from those facts. *Matsushita,* 475 U.S. at 587; *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005). The Court may not "weigh the evidence in the

3

summary judgment record, decide credibility questions, or determine the truth of any factual issue." *Kampouris v. St. Louis Symphony Soc.,* 210 F.3d 845, 847 (8th Cir. 2000).  The court is required, however, to resolve all conflicts of evidence in favor of the nonmoving party.  *Robert Johnson Grain Co. v. Chemical Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976).

### **Facts[2]**

Viewed in the light most favorable to Woolverton, the record establishes the following facts.  On April 11, 2016, at approximately 10:10 p.m., Redden stopped Woolverton on the side of the road at the intersection of Railroad Street and Broad Street as Woolverton was leaving a bar.  Redden states that he stopped Woolverton because he was playing loud music and because his license plate light was not working.[3]  Woolverton provided Redden with a copy of his ID.  While running a check on Woolverton's ID, Redden discovered that Woolverton had an outstanding warrant for his arrest through the City of Malden for contempt of court (failure to appear).  (Do. 77-2 at p. 65.)  Redden requested backup assistance from Rudd approximately three minutes later, at 10:13 p.m.

The parties' stories diverge significantly at this point.  Redden states that Woolverton became irate about the stop, and began "cursing and threatening" Redden.  Redden asked Woolverton to exit his vehicle when he learned about the warrant.  Redden attempted to perform a pat-down of Woolverton, but he was unable to complete one as Woolverton became further agitated and continued to jerk, twist, and turn during the pat-down process.  Redden proceeded to

---

[2]The facts are taken from Defendants' Statement of Uncontroverted Material Facts (Doc. 77-1) and Plaintiff's Statement of Additional Uncontroverted Facts (Doc. 79).
[3]Woolverton denies that he was playing loud music and that his license plate light was out.  He claims that Redden never told him why he stopped him, although he believes Redden was "showing off" for a woman who was in the passenger seat of his patrol vehicle.  Redden admits he had a female passenger.

4

put Woolverton in handcuffs and place him in his patrol vehicle.  He stated that he noticed on multiple occasions during the stop that Woolverton's pupils were very small, which he considered a sign that Woolverton may be on narcotics.   Shortly thereafter, Rudd arrived on the scene and Redden requested that Rudd perform a pat-down on Woolverton for the officers' safety, given that Redden had been unable to complete one.

Rudd got Woolverton out of Redden's patrol vehicle, noting that Woolverton was irate and began cursing at Rudd.  Rudd continually asked Woolverton to be still and cooperate during the pat-down process, but Woolverton continued to jerk, twist, and turn, while cursing at Rudd.  During this interaction, Rudd noticed what appeared to be a gun in Woolverton's back pocket.  Woolverton then made several attempts to kick backwards or "horse kick" at Rudd.  This action prompted Rudd to put his arm in between Woolverton's arms and back and take him to the ground by placing one leg in front of Woolverton's legs.

Prior to Rudd's attempted pat-down, Redden used his K-9 to evaluate Woolverton's vehicle.  The K-9 alerted at one spot on Woolverton's vehicle, indicating that the vehicle may have drug paraphernalia inside.[4]  Deputy Holloway arrived at the scene while Rudd attempted to complete a search of Woolverton.  Holloway and Redden heard a "commotion" and cursing, which prompted them to rush to Rudd's aid to see if he needed assistance.  While coming around the curve of the vehicle, Redden saw Woolverton attempt to horse kick Rudd.  Once on the ground, Redden held Woolverton's upper body to prevent Woolverton from moving so that Rudd could remove the item out of Woolverton's back pocket.  Rudd and Redden completed the pat-down and found the following items on Woolverton: a deer bone they state resembled the handle

---

[4] It is undisputed that no contraband was found during the search of Woolverton's vehicle.. (Doc. 83-1 at p. 6.)

5

of a gun from inside Woolverton's back pocket, multi-tool plyers, a pocketknife, a metal punch, and two unspent rifle casings.  Woolverton began to complain of right leg pain and indicated that he thought his leg was broken.  Rudd and Redden assisted Woolverton into their patrol vehicle by getting on each side of him and offering support as he got into the vehicle.  They claim that they offered to call an ambulance for Woolverton, but Woolverton refused one.  Rudd and Redden transported Woolverton to Pemiscot Memorial Hospital in Hayti, Missouri, where Woolverton received medical treatment for his injuries.

Woolverton claims that he was not irate or threatening during the arrest, and did not resist the officers in any way.  He denies that his pupils were small, and states that he had not used drugs within twenty-four hours of the incident.  According to Woolverton, Redden called Woolverton vulgar names while he was handcuffed in the patrol vehicle and told him that he was going to "kick his ass."  Rudd made similar remarks.   When Rudd arrived, the officers instructed Woolverton to get out of the police vehicle and open the trunk of his truck.  Woolverton complied and then stood by the police vehicle while the officers searched his truck.  After the officers completed the search, Rudd came up from behind Woolverton and slammed his head into the vehicle while he was handcuffed.  Woolverton "held his ground" by using the weight of his legs to prevent Rudd from pushing him forward and slamming him against the vehicle a second time.  Woolverton did not try to horse kick Rudd.  Woolverton was then taken to the ground face down by Rudd and Redden while his hands were cuffed behind his back.  Redden placed a "scissor lock" on Woolverton's legs, which worked as a fulcrum and caused his leg to snap when he was taken to the ground into a ditch.  Woolverton immediately complained that his leg was broken.  Defendants roughly hauled him into the patrol vehicle and transported him to Pemiscot Memorial Hospital.  They did not offer to call an ambulance.  X-rays revealed an

6

interarticular comminuted fracture and comminuted proximal fibular fracture. Woolverton was transferred by ambulance to Barnes Jewish Hospital in St. Louis, where he ultimately underwent two surgeries. He also suffered facial abrasions, which Woolverton attributes to Rudd slamming his face into the vehicle.

## Discussion

An official sued in his individual capacity is entitled to summary judgment based on qualified immunity unless (1) the evidence, viewed in the light most favorable to the nonmoving party, establishes a violation of a federal constitutional or statutory right, and (2) the right was clearly established at the time so that a reasonable officer would have understood that his conduct violated that right. *Capps v. Olson*, 780 F.3d 879, 884 (8th Cir. 2015) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

The court must follow a two-step inquiry in a qualified immunity analysis: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009). A right is clearly established if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). The relevant question is whether a reasonable officer would have fair warning that his conduct was unlawful. *Brown*, 574 F.3d at 499; *see also Buckley v. Ray*, 848 F.3d 855, 863 (8th Cir. 2017); *Blazek v. City of Iowa City*, 761 F.3d 920, 922-23 (8th Cir. 2014).

The Court may address the questions in either order, but a § 1983 plaintiff can defeat a claim of qualified immunity only if the answer to both questions is yes. *Boude v. City of Raymore*, 855 F.3d 930, 933 (8th Cir. 2017) (citing *Pearson*, 555 U.S. at 236). "If either

7

question is answered in the negative, the public official is entitled to qualified immunity." *Norris v. Engles*, 494 F.3d 634, 637 (8th Cir. 2007) (quoted case omitted).  Thus, to avoid summary judgment, Woolverton must produce sufficient evidence to create a genuine issue of material fact as to whether Waite violated a clearly established constitutional right.  *De La Rosa v. White*, 852 F.3d 740, 743 (8th Cir. 2017).

      **A.**      **Violation of a Constitutional Right**

As previously stated, Woolverton alleges Rudd and Redden used excessive force in four separate instances during his arrest: (1) in slamming his head into a police vehicle; (2) in taking him to the ground while his hands were cuffed behind his back, causing his leg to break; (3) in roughly hauling him about, knowing his leg was broken; and (4) in roughly hauling him into the police vehicle instead of calling an ambulance.

As an initial matter, the Court notes that Defendants only argue they are entitled to qualified immunity as to the takedown maneuver.  Specifically, Defendants argue that "Defendants' actions did not constitute excessive force as the maneuver of taking Woolverton to the ground was reasonable given the situation."  (Doc. 77 at p. 5.)  Defendants do briefly address Woolverton's other alleged incidents of excessive force within their argument.  They contend that neither Rudd nor Redden slammed Woolverton's head into the police vehicle, and that the facial abrasions Woolverton suffered occurred during the "scuffle" that ensued when Redden utilized the takedown maneuver.  *Id.* at p. 7.  Defendants further state that, after employing the takedown maneuver, they "assisted Woolverton into their patrol vehicle and drove Woolverton to the hospital as he had refused an ambulance."  *Id.* at p. 9.  Because Defendants' Motion only claims entitlement to qualified immunity as to the takedown maneuver, Defendants are not

entitled to summary judgment with regard to the other alleged incidents of excessive force. The Court's analysis will, therefore, focus on the performance of the takedown maneuver.

Claims that law enforcement officers have used excessive force in the course of an arrest or other "seizure" are analyzed under the Fourth Amendment and its "reasonableness standard." *Graham v. Connor*, 490 U.S. 386, 394-96 (1989). The question the Court must ask is whether, under the totality of the circumstances, the officer's actions were "objectively reasonable." *Cook v. City of Bella Villa*, 582 F.3d 840, 849 (8th Cir. 2009) (quoting *Graham*, 490 U.S. at 396). In determining whether the force used was reasonable, relevant circumstances include the severity of the crime, the danger the suspect poses to the officer or others, and whether the suspect is actively resisting arrest or attempting to flee. *Id.* The degree of injury suffered, to the extent "it tends to show the amount and type of force used," is also relevant to our excessive force inquiry. *Chambers,* 641 F.3d at 906. And while "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment," *Cook,* 582 F.3d at 849, "force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public," *Brown,* 574 F.3d at 499. Ultimately, the reasonableness of the force applied must be judged from the perspective of a reasonable officer on the scene "rather than with the 20/20 vision of hindsight." *Id.* at 496. Reasonableness under the Fourth Amendment is generally a question of fact for the jury. *Duncan v. Storie*, 869 F.2d 1100, 1103 (8th Cir. 1989); *Patzner v. Burkett*, 779 F.2d 1363, 1371 (8th Cir. 1985).

Defendants argue that their use of force was objectively reasonable in light of a tense, rapidly evolving situation. They contend that, given Woolverton's "active and rapidly escalating resistance, Rudd was entitled to use a lawful takedown maneuver, to control Woolverton and

9

Redden was authorized to hold Woolverton on the ground so that Rudd could remove what was believed to be a gun from Woolverton's back pocket." (Doc. 77 at p. 9.) They urge the Court to consider the following facts as warranting the takedown maneuver: the incident occurred on the side of the road at night near Woolverton's vehicle; Redden's drug detecting K-9 had indicated that there may be paraphernalia in Woolverton's vehicle; Woolverton's pupils were small; Woolverton protested verbally and cursed; and Woolverton physically resisted when he attempted to horse kick Rudd during a pat-down.

Defendants rely primarily on *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1011 (8th Cir. 2017), which found an officer did *not* violate the Fourth Amendment by executing a takedown of a nonviolent misdemeanant when dash camera video footage revealed the officer twice ordered the suspect to place his hands behind his back, but the suspect continued walking away. The Court concluded that a reasonable officer would interpret the subject's behavior as "noncompliant," and reasoned that he "at least appeared to be resisting" when he continued to walk away, so the officer was "entitled to use the force necessary to effect the arrest." *Id.*

Woolverton argues that *Ehlers* is distinguishable, in that dash camera video showed that Ehlers ignored the officer's commands and continued to walk away. *See id.* at 1007. The undersigned agrees. There was no dispute in *Ehlers* that the plaintiff was noncompliant as the camera footage confirmed it. Additionally, Ehlers was not restrained and, instead, was walking away from the officers when the takedown maneuver was executed. Under those circumstances, fraught with danger and unpredictability, a reasonable officer would be entitled to use force to effect the arrest.

In the instant case, however, the parties agree on very few facts surrounding the alleged excessive force incident. Specifically, the parties dispute the following facts: whether

Woolverton's pupils were small; whether Woolverton protested verbally; whether Woolverton jerked, twisted, and turned during the pat-down process; whether it appeared as though Woolverton had a gun in his pocket; whether Redden participated in the takedown maneuver; and whether Woolverton attempted to horse kick Rudd during a pat-down.

Defendants support their account of the incident with their own deposition testimony. (Docs. 77-2, 77-5.)  Defendants have also submitted the deposition testimony of Deputy Holloway, who testified that Woolverton was laying in the ditch with his hands cuffed behind his back when he arrived at the scene.  (Doc. 77-6 at p. 15-16.)  He testified that Woolverton was "cussing everybody" and Redden and Rudd were "yelling at the guy telling him to stop." *Id.* at 16.  Holloway stated that he did not see Woolverton try to kick anyone; rather, he described Woolverton as "loud and obnoxious." *Id.* at 23.  He testified that Woolverton complained that his leg hurt, and Redden and Rudd picked him up and helped him into the vehicle. *Id.* at 20-21.

Woolverton has set forth his own deposition testimony supporting his account of the incident.  (Doc. 78-4.)  He testified that Rudd came up from behind him and started slamming his head against the patrol vehicle. *Id.* at p. 18.  Woolverton stated that he "held his ground" by using the weight of his legs to prevent Rudd from pushing his torso forward anymore. *Id.* at 19. Next, Woolverton testified that he "looked to the side, and [saw] Officer Redden slide in with a scissor move around my legs." *Id.*  He described the "scissor move" as follows:

> With my handcuffs and [I] have my hands in the cuff.  I see Casey Redden coming in here and slide with his leg and lock my legs in, and as soon as that happened, Rudd pushed me over and my leg broke on the way down.

*Id.* at 20.  Woolverton started "hollering my leg is broke." *Id.*  He testified that Defendants next took the following actions:

11

> And they start dragging me around and telling me my leg is not broke, and my leg is dangling. I'm in intense pain at that time, and I am just saying my leg is broke, and they keep saying, no, it's not broke.
>
> And then all I remember is them tussling me and pulling me around and then finally trying to get me up in the SUV or back in the SUV.

*Id.* Woolverton testified that Redden was calling him names the entire time, and that Woolverton "at any time hadn't made any violent or any kind of move toward the officer." *Id.* at 21.

In the context of summary judgment and qualified immunity for excessive force, "[o]nce the predicate facts are established, the reasonableness of [an officer's] conduct under the circumstances is a question of law." *Malone v. Hinman*, 847 F.3d 949, 953 (8th Cir. 2017) (second alteration in original) (quoting *Tlamka v. Serrell*, 244 F.3d 628, 632 (8th Cir. 2001)). If genuine disputes of material fact underlie either prong of the qualified immunity inquiry, the district court may not resolve the disputes of fact and qualified immunity must be denied. *See Wealot v. Brooks*, 865 F.3d 1119, 1125 (8th Cir. 2017) (noting courts may not resolve genuine issues of material facts under either prong and determining the plaintiff had identified two genuine disputes as to whether the officer's conduct was objectively reasonable); s*ee also Raines v. Counseling Assocs., Inc.*, 883 F.3d 1071, 1074-75 (8th Cir. 2018) (dismissing appeal of denial of qualified immunity for lack of jurisdiction and explaining a key factual issue underlying the reasonableness of the officers' actions, whether the suspect advanced on an officer prior to being shot, was both material and disputed).

Viewing the evidence in the light most favorable to Woolverton, the Court cannot conclude that Defendants' use of force was objectively reasonable as a matter of law. It is undisputed that Woolverton was an unarmed arrestee for a nonviolent crime, whose hands were cuffed behind his back when Defendants employed a takedown maneuver that fractured his leg.

Woolverton testified that he did not threaten Defendants, he neither used nor was in possession of drugs that night, he did not physically resist during the pat-down, and did not otherwise behave aggressively toward Defendants during the incident. He admitted that he "might have" cursed when Rudd and Redden threatened to "whoop" him, but denied employing any physical resistance. (Doc. 77-4 at p. 67.)

Woolverton's testimony creates a material factual issue as to whether the amount and degree of force used by Defendants surpassed what was objectively necessary in the situation at hand. Even assuming Woolverton was argumentative and cursed at Defendants during the incident, "verbal abuse alone does not justify the use of any force." *Bauer v. Norris*, 713 F.2d 408, 413 (8th Cir. 1983); *see also Van Raden v. Larsen*, No. 13-2283 (DWF/LIB), 2015 WL 853592, at *7 (D. Minn. Feb. 26, 2015) (finding fact issues as to the reasonableness of the use of a taser where plaintiff, although resisting being removed from his home and verbally expressing his anger and frustration, was not violent towards the officers or attempting to flee, and did not have a weapon). In assessing whether the force used during the takedown maneuver was objectively reasonable, the Court has also considered the severity of Woolverton's injury. *See Rohrbough v. Hall,* 586 F.3d 582, 586 (8th Cir. 2009) (although not dispositive, the severity of the injuries she sustained is a relevant factor in determining the reasonableness of the force used). It is undisputed that Woolverton sustained a severe fracture of his leg that required transportation by ambulance to St. Louis and multiple surgeries. (Doc. 83-1 at p. 3.)

The facts of the instant case are similar to those in *Montoya.* In *Montoya,* two officers responded to a domestic dispute between the plaintiff and her ex-boyfriend at the ex-boyfriend's home. 669 F.3d at 869. Upon their arrival to the residence, the officers witnessed the plaintiff and her ex-boyfriend arguing outside. *Id.* The ex-boyfriend stood between the two officers,

13

while the plaintiff stood opposite of them, approximately ten to fifteen feet away.  *Id.*  The officers stated that the plaintiff had taken a step forward and raised her fist, but, according to the plaintiff's account, she was merely using her hands to express herself.  *Id.*  One of the officers grabbed the plaintiff's left arm, put it behind her back, and handcuffed her left wrist; and the second officer attempted to get the plaintiff's right arm behind her.  *Id.*  The first officer then performed a takedown of the plaintiff, causing her to fall to the ground face first.  *Id.*  The officer fell on top of the plaintiff.  *Id.*  The takedown fractured the plaintiff's knee.  *Id.* at 870.

The Eighth Circuit Court of Appeals held that the officer's takedown of the plaintiff was not objectively reasonable under the circumstances.  *Id.* at 871.  First, the Court noted that the plaintiff posed no threat to the safety of the officers or others, as she was "standing ten to fifteen feet away from [the ex-boyfriend] when she raised her hands above her head in frustration.  She assert[ed] she did not intend to hit [the ex-boyfriend], and [he] testified he did not feel threatened by her actions."  *Id.*  Second, the plaintiff "was not actively resisting arrest, and [she] was not attempting to flee."  *Id.*  Third, the plaintiff's "actions amounted to a violation of a law restricting disorderly conduct, a misdemeanor."  *Id.*  Fourth, "although not dispositive, the severity of the injuries she sustained[—a broken leg—was] a relevant factor in determining the reasonableness of the force used."  *Id.* at 872 (citation omitted).  The Eighth Circuit disagreed with the district court that the "fact Montoya sustained a broken leg is simply an 'unfortunate' and 'unintended' consequence of what the court described as objectively reasonable use of force by Officer Hooper."  *Id.*  The Eighth Circuit concluded that genuine issues of material fact existed as to whether the officer used excessive force against Montoya.  *Id.*

Just as in *Montoya*, the officers and Woolverton presented differing factual accounts, creating genuine issues of material fact.  If Woolverton's account is believed, Woolverton was

14

nonviolent, was not threatening anyone, was not actively resisting arrest, and was not attempting to flee, when the officers took him to the ground while his hands were cuffed behind his back with such force as to fracture his leg. Even assuming it was reasonable for the officers to believe the objects Woolverton had in his pocket resembled a gun, there was no need to employ force if Woolverton was compliant with his hands cuffed behind his back. "While a jury may credit [the officers'] characterization of the incident and disbelieve [Woolverton] at trial, it is not our function to remove the credibility assessment from the jury." *Id.*

Thus, Woolverton has presented sufficient facts, when viewed in the light most favorable to him, to show Redden and Rudd violated a constitutional right.

### B.  Clearly Established

Defendants argue that, even if the force utilized by Defendants during the takedown maneuver constituted excessive force, Woolverton has failed to establish that such conduct violated a clearly established statutory or constitutional right and that such a right existed at the time of the incident. Defendants contend that it has not been clearly established that "use of a takedown maneuver is in and of itself unconstitutional, especially when resisting arrest or actively resisting cooperating with an officer during a pat-down." (Doc. 77 at p. 16.)

"The right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person." *Copeland v. Locke,* 613 F.3d 875, 881 (8th Cir. 2010) (internal quotation marks and citation omitted). The Eighth Circuit, however, has also explained that "'the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that

15

what he is doing violates that right.'" *Shannon v. Koehler,* 616 F.3d 855, 864 (8th Cir. 2010) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)).

Assuming again that Woolverton's story is true, the Court finds that the contours of the right at issue were sufficiently clear to inform a reasonable officer in the Defendants' position that it was unlawful to employ a takedown maneuver on a motorist suspected of a nonviolent, minor crime, who was not threatening anyone, was not actively resisting arrest, was not attempting to flee, and was restrained with handcuffs. *See Montoya*, 669 F.3d at 872-73 (clearly established it was unlawful for officer "to perform a 'leg sweep' and throw to the ground a nonviolent, suspected misdemeanant who was not threatening anyone, was not actively resisting arrest, and was not attempting to flee"); *Blazek*, 761 F.3d at 925 (internal citation omitted) ("It was clearly established in 2009 that when a person is subdued and restrained with handcuffs, a 'gratuitous and completely unnecessary act of violence' is unreasonable and violates the Fourth Amendment."); *Brown,* 574 F.3d at 499 ("[I]t is clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public.").

Because fact issues remain regarding whether Defendants violated Woolverton's clearly established rights in employing the takedown maneuver, Defendants' Motion for Summary Judgment will be denied. *See, e.g., McDowell v. Blankenship*, No. 4:08–CV–602 (SNLJ), 2012 WL 3095520, at *8 (E.D. Mo. July 30, 2012) (denying summary judgment on an excessive use of force claim due to dispute about whether the plaintiff resisted arrest); *Blair v. Brown*, No. 4:10–CV–1973 (JCH), 2011 WL 6715888, at *6 (E.D. Mo. Dec. 21, 2011) (denying summary judgment on excessive use of force claim because the parties "have drastically different accounts

16

of Plaintiff's arrest"); *Kukla v. Hulm*, 310 F.3d 1046, 1050 (8th Cir. 2002) (affirming the denial of summary judgment due to a genuine issue of whether force used was excessive).

Accordingly,

**IT IS HEREBY ORDERED** that the Defendants Christopher Rudd and Casey Redden's Motion for Summary Judgment (Doc. 76) is denied.

s/*Abbie Crites-Leoni*
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 28th day of May, 2020.